Mr. George Wylesol             Malik Solomon
Clerk Of Court                  KC-2341
United State District Court     SCI-Phoenix
601 Market Street               1200 Mokychic Drive
Philadelphia Pa. 19106-9865     Collegeville Pa. 19426


RE: SOLOMON VS. CITY OF PHILADELPHIA, 24-5606, (Civil Action)
    PLAINTIFF'S RESPONSE TO DEFENDANT'S, MOTION TO DISMISS

Dear Mr. Wylesol;

       GREETINGS:

       Enclosed kindly find my "PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS" pursuant F.R.Civ.P. RULE 12(b)(6), please file this on my behalf.

       The Defendant's Counsel's have been served as well as The Honorable Judge Schmehl, as shown in the Certificate of Service, thank you for your time and anticipated assistance.

                                          Respectfully

                                          [signature]
                                          Malik Solomon
                                          KC-2341, SCI-Phoenix
                                          1200 Mokychic Drive
                                          Collegeville Pa. 19426

DATE: 2-10-26


cc: The Honorable Judge
    Jeffrey L. Schmehl
    Derek Kane, Esq.
    Sara Gray Esq.
    file

```
         IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

MALIK SOLOMON
      Plaintiff        :   CIVIL ACTION
                        :
      VS.                  :   No. 24-5606
                        :
CITY OF PHILADELPHIA, et al.,    :
      Defendants           :   Jeffrey L. Schmehl, J.

### O R D E R

AND NOW, this _____ day of _____, 2026, upon consideration of the Defendant's Motion To Dismiss, Rule 12(b)(6), and the Plaintiff's Response to the Defendant's Motion To Dismiss, it is **HEREBY ORDERED** that the Motion To Dismiss is **DENIED**.

It is further ORDERED that the Plaintiff and the Defendant's shall proceed under discovery.

                                      BY THE COURT

IT IS SO ORDERED:                        _____
                                      JEFFREY L. SCHMEHL,    J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MALIK SOLOMON<br>　　　　Plaintiff<br><br>VS.<br><br>CITY OF PHILADELPHIA, et al.,<br>　　　　Defendants | CIVIL ACTION<br><br>No. 24-5606<br><br>Jeffrey L. Schmehl, J. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO
DISMISS AMENDED COMPLAINT FOR FAILURE TO STATE
A CLAIM, & MEMORANDUM OF LAW, IN SUPPORT

The Plaintiff's Amended Complaint in meant to present two Eighth and Fourteenth Amendment violations, the Immediate Cause, is related to three other unnamed Defendants in the Deputy City Solicitor's instant F.R.Civ.P. Rule 12(b)(6) Motion, however, the Proximate Cause of the harm caused to the Plaintiff belongs to the Defendants named in the instant Rule 12(b)(6) Motion, i.e. Sergeant Nunes, CO. M. Marlow, CO. Ramel Young, CO. Jason Kurth, CO. Krystyna Hayles, and CO. Holly Callahan, here after collectively known as the **"CERT TEAM"** Defendants, and/or Correctional Officers, employed by the City of Philadelphia, to manage any emergency situations that may arise at the "Philadelphia Industrial Correctional Center," "PICC" (Pick).

The Plaintiff's Amended Complaint, (ECF No.6) presents FIVE (5) Paragraphs No.s, 18, 19, 20, 21, and 22, that relate to the actions and non-actions of the CERT TEAM Defendants, which is only ONE of FIVE **CERT TEAMS** that the Philadelphia Industrial Correctional Center, **(PICC)**, employs for High Security procedures within the County Prison known as PICC.

1.

PROCEDURAL STATEMENT CERT TEAM DEFENDANTS:

Granted that the Facts, (Not Allegations) in the Amended Complaint, relating to the CERT TEAM Defendants are crudely drafted and concisely presented, however, this is only because the Defendant's who participated in th June 28, 2023, CERT TEAM actions strayed dramatically from the Norms of the FOUR (4) other CERT TEAM's, with respect to high security procedures, customs, and practices that the Philadelphia Industrial Correctional Center ("PICC"), demands that each CERT TEAM member must routinely follow. In so, whether the CERT TEAM Defendants WERE NOT properly trained or that they acted with DELIBERATE INDIFFERENCE, is a question for this Honorable Court to decide.

The Plaintiff's contends that **(1)** from the time that this specific CERT TEAM entered the Cellblock, **(2)** the time that they remained on the Cellblock, and **(3)** the manner and actions upon which they Exited the Cellblock, all fell below the acceptable standard, procedures, customs, and practice, required of a PICC, Correctional Emergency Response Team, otherwise known as **CERT**.

A CERT TEAM was developed to be a Highly Trained Emergency and Extraction Unit, it is a practice that not any ordinary Correctional Officer, (CO.) can become, or is allowed to become, a member of the CERT TEAM, There can be up to Four-to-Five CERT TEAMS at one time in any of the Philadelphia County Prisons.

Each Philadelphia County Prison has a GENERAL HEADQUARTERS, that is separated from the rest of the Prison, where the CERT TEAM members develop their plan of action for that day, they review all information reports submitted by each Cellblock Sergeant concerning the general population, and they design their

2.

methods of attack on certain inmates that they received a report on. They also receive information from the intake reports that are submitted on new inmates who arrive into PICC, they look for information on inmates who are gang members, big time drug dealers, high profile inmates who controlled a section of one of the many Philadelphia neighborhoods, and repeat offenders who keep returning to PICC. they keep records and files on these inmates, and monitor their location and movement within the prison. However, the main source of the information that the CERT TEAM receives, comes from Jail House SNITCHES, or RATS, that the CERT TEAM utilizes when they perform 95% of their Cell Searches, without this source of information the CERT TEAM would basically be a HIT-AND-MISS Search Team.

The DRILL that all CERT TEAM members perform when they act upon a contraband Cell Search, or an Extraction of an inmate from his cell, like when they transport an inmate to the R.H.U. (Restrictive Housing Unit)(The Hole) is that they will gather into a Team, and leave their Head Quarters, and that while on route to their destination they will not speak to anyone, this includes other prison guards, and the other Guards and Staff will not try and speak to them.

Upon entering a Cellblock, before they go to the cell that they are targeting, they clear the Cellblock, (Make All Inmates Go to their Cells and Lock Up!!), they than proceed to the Cell as a group, and enter the Cell in force as a Group, Ninety-Nine (99) percent of the time they make the inmate strip, and examine his naked body for contraband that may be taped to his body or that he is trying to hide in a certain spot on his person.

3.

After the CERT TEAM finishes the Strip Search they Search the inmates clothing then Hand Cuff the Inmate and have him stand outside of his Cell facing a wall with his forehead on the wall, they then proceed to go through every item in his Cell, and closely examines under the Bed, Sink, and any other structure within the cell, and if they find any contraband, they take the inmate to the R.H.U. and the Contraband to their Head Quarters.

This show of force, or Group movement when the CERT TEAM enters a Cell, is to discourage an inmate from getting loud, with them like yelling, Cursing or threatening them, and almost never want to fight when there is a Group of Guards present.

If the CERT TEAM has two or more cells to conduct a search upon, it is much safer for them to go from one cell to another with everyone else locked in their Cell, plus the other targeted Cell can not take the Contraband out of their Cell and hide it some place else, and as explained the chances for a confrontation with a bunch of inmates is removed from the mission, if the need comes where the targeted inmate has to be transferred, even if it is just for further questioning, he can be taken off the Cellblock without intervention from other inmates, therein, the two most important procedures that a CERT TEAM does is **ONE** empty the Cellblock, (lock everyone in their cell), **TWO**, act and move as a Group!! However, these procedures were cast aside by the CERT TEAM that entered Plaintiff's Cellblock on June 28, 2023.

RECITAL OF PLAINTIFF'S COMPLAINT:

On June 28, 2023, Plaintiff was out of his cell working on the Cellblock when the CERT TEAM Defendant's entered. (¶.18).

4.

When the CERT TEAM entered the Cellblock, they split up, two of the CERT TEAM Defendant's went by themselves to CELL #18. and when they opened the Cell door, the inmate and the two CERT TEAM members got into a fight, the two CERT TEAM Members started yelling, and it was only this Yelling that caused the OTHER members of the CERT TEAM to run to their aid. (¶.19)

While the FIGHT between the two CERT TEAM Defendant's was going on in Cell #18, One of the CERT TEAM members directed the Crowed of Inmates who were watching the fight in Cell #18, which included Your Plaintiff, to "Stay Back From The Cell", then two of the remaining CERT TEAM Defendant's went into the Cell, and "Took Control Of The Situation Inside Cell 18." then two of the CERT TEAM Defendant's, said to a few of the other CERT TEAM Defendant's that, "They Located A Cell Phone (Controband) (Sic), And To Contact Defendant, Sergent (Sic) Black" (¶.20).

When the CERT TEAM Defendants quit the Cell Search, they must have forgot about the seriousness of the **earlier FIGHT**, and the High Rated Contraband Cellphone, because once, they "Ended The Search They Locked The (inmate aggressor John Doe #1) In His Cell And Reported To The Block Officer Defendant, C. Brooks 'Do Not Open The Door As They Found A Cell Phone, And They THINK There Is A Weapon Hidden, As He Was Hiding Something On His Body Before They Entered'", (¶.21), The CERT TEAM Defendant's must not have cared if the "Aggressor" inmate inside of Cell #18, kept the "Weapon" or not, or if the FIGHT mattered, because all the CERT TEAM did was direct Defendant C. Brooks, to make sure she put "INMATE ON STAFF ASSULT" (Sic) on the "Misconduct" report about the Fight. (¶.21)

5

Once a CERT TEAM enters a Cellblock, the policy and custom is that they Automatically become the Controlling Officers, since they are alleged to be highly trained in Security Rules and the Internal Rules of PICC. also their actions are not to be questioned, in so, after the <u>Cell Phone</u>, Inmate on Staff <u>Fight</u>, confiscated <u>Cell Phone</u> and although Defendant C. Brooks, did not conduct the Cell Search herself, nor did she witness the CERT TEAM's actions, they directed her to forge Misconduct, as if she actually conducted the Cell Search herself, (¶.21), the CERT TEAM Defendant's then stood around for a while talking with the inmates and each other, and when they felt like it, without researching Cell #18, for the weapon, or taking the Assualtive Inmate in Cell #18, to the R.H.U. for the <u>FIFGHT</u> and the Contraband <u>CELL PHONE</u>, they just left the Cellblock.(¶.22)

CONTINUATION OF PLAINTIFF'S COMPLAINT:

The remainder of the Complaint relates to different facts, and involves different Defendant's, and although the same Grounds, (Eighth and Fourteenth Amendments) it is couched under Retaliation and Failure To Protect stemming from Intentionally Allowing Your Plaintiff to be assaulted and Stabbed by the Inmate in Cell #18, and his Cell Partner, only hours after the CERT TEAM Defendant's decided to EXIT the Cellblock leaving the known assaultive inmate in Cell #18 with a weapon on him. However, the CERT TEAM's actions caused Your Plaintiff to receive cuts on his Head, Neck, Arms, and hands, some wounds are defensive, the majority were inflicted by the Inmate left in Cell #18, required stitches in an outside hospital, leaving Plaintiff SCARED for life, traumatized, and now taking medication for ever since the life changing incident.

6.

## POINTS OF LAW FOR CONSIDERATION:

Your Plaintiff respectfully moves this Honorable Court to consider the Plaintiff position and limitations he faces from being a state prisoner, and untrained in the many legal points of the "Prison Litigation Reform Act." (PLRA) and the demands put on him under 42 U.S.C. §1983, and by so he begs this Honorable Court for as liberal a review as possible.

In the instant case, the fact that the CERT TEAM left the Cellblock with the possibility that a weapon remained in Cell#18, presented a foreseeable risk of harm, combined with the fact that your Plaintiff was assaulted with a weapon only hours later by the inmate who the CERT TEAM left in Cell #18, your Plaintiff was stabbed so severely by this inmate that he was taken to an outside Hospital where he received Stitches in these stab wounds and sets a Cause of Action under the Eight and Fourteenth Amendments for a claim of "Deliberate Indifference" for failure to protect, as there is a casual connection between the actions of the named Defendants and the harm cause to the Plaintiff.

The Supreme Court, dealing with the subjective component of the applicable Eight Amendment inquiry, unanimously held that prison officials could be liable in damages for their deliberate indifference in failing to protect inmates from harm caused by other inmates. <u>Farmer VS. Brennan</u>, 511 U.S. 825, 114 S.Ct, 1970, 128 L.Ed. 2d, 811 (1994). Significantly, the Court construed deliberate indifference in a subjective manner as meaning the failure to act when prison officials knew of a "substantive risk of serious harm," even where an inmate did not warn them of a particular threat and even if they did not believe that harm

7.

would occur to a particular inmate. It explained; "[S]ubjective recklessness as used in criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for deliberate indifference under the Eighth Amendment. Farmer, 114 S.Ct at 1980. See-Exhibit-A.

Although the Eighth Amendment does not protect inmates against an objectively de minimis use of force by prison guards, (None of the Plaintiff wounds were de minimis) the Third Circuit reversed the district court which held that as a matter of law that there was no Eighth Amendment violation because the Plaintiff inmate's injuries were de minimis. The Third Circuit declared that de minimis injuries did not necessarily establish de minimis force. Rather the de minimis nature of the injuries together with the circumstances in order to determine whether there was an Eight Amendment violation under Hudson. (Hudson VS. McMillian, 503 U.S. 1, 112 S.Ct. 995, 117 L. Ed. 2d 156 (1992)) The Third Circuit also declared; "We hold that a corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under §1983 if the corrections officer had a reasonable opportunity to intervene and simply failed to do so." Smith VS. Mensinger, 293 F.3d 641, 650, (3rd Cir. 2002). "simply failed to do so" is the crux of the Claim herein presented before this Honorable Court, whether the CERT TEAM had "a reason opportunity", herein, Your Plaintiff presents that they had full knowledge, and opportunity, jet failed to do so. Subsequently, only hours later the Plaintiff was assaulted and stabbed by the inmate they believed had a weapon on him.

8.

As stated, a "Normal" CERT TEAM, carries a persona of professionalism when they conduct their duties, and follow the policies of Security and training, the question now is whether the specific CERT TEAM that conducted the Search of Cell #18, on June 28, 2023, was not properly trained, or just flat out Deliberate Indifferent, putting your Plaintiff in a dangerous living environment, Where prison staff and officials fail to follow their own policy, or rules and regulations, there is a clear indication of deliberate and intentional indifference. Pierson VS. Hartley, 391 F.3d 898, 903-04 (7th Cir. 2004), "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether the inmate faces an excessive risk of attack for reasons that are personal to him, or because all of the prisoners face the same attacks." "Furthermore, where there is not a prison policy that addresses a particular issue, it can be found to constitute deliberate indifference." There is also a plethora of court rulings that deal with those prisoners that pose an "obvious risk" of attack and harassment. Johnson VS. Johnson, 385 F.3d 503, 526-27 (5th Cir. 2004); Spruce VS. Sargent. 149 F.3d 783, 785-86 (8th Cir. 1998); Heams VS. Terhune, 413F. F.3d 1036, 1041 (9th Cir. 2025). Where prison officials place a prisoner in a situation of danger from others who are known to be aggressive and violent this violates the Constitution. This is especially true where prison staff have identified a particularly aggressive and violent inmate and failed to take adequate measures to protect other inmates from them. Gulet VS. Haines, 226 F. Supp. 2d 806, 821-24 (S.D. Ohio 2002).

---CONCLUSION---

WHEREFORE, For the reasons set forth above, your Plaintiff humbly moves this Honorable Court to deny the Defendant's Motion To Dismiss under F.R.Civ.P. RULE 12(b)(6), for as stated, it is granted that the FIVE Paragraphs in the Complaint are crudely drafted, and presents the actions of the Defendant's (CERT TEAM) in concise detail, however, had it not been for the Proximate Cause actions or inactions of these named defendants, Your plaintiff would have never revived the multiple stab wounds and stitches he received from the weapon left in Cell #18, by the above named Defendant's, wherein Your Plaintiff is now scared for life, and living under the mental trauma for which plaintiff is now under the supervision of a psychiatrist, who has Your Plaintiff under a medication for his mental stability. i.e. constant fear of authority (Prison Guards), and high anxiety drifts. In so Your Plaintiff prays this Honorable Court will deny the Defendant's Rule 12 (b)(6) Motion To Dismiss, as the Plaintiff herein has presented an Eighth Amendment Claim of Deliberate Indifference that should be allowed to proceed to a Trial By Jury.   For This Your Plaintiff Humbly Prays.

Respectfully Submitted

DATE: 2-10 26

Malik Solomon KC-2341
SCI-Phoenix
1200 Mokychic Drive
Collegeville, PA. 19426

10.

# LOCKED & LOADED WITH DANGER

## Drug deaths, ODs plague Philly jails, raising concerns about Kensington plans

By Samantha Melamed
and Aubrey Whelan
*Staff Writers*

Donna McDonough used to pray that her daughter, Kelly Ann Crawford, would be arrested.

Crawford had bipolar disorder and was addicted to fentanyl and Xanax. She'd tried drug treatment several times, McDonough said. But she always ended up back in Kensington, where she was unhoused and broke but somehow regularly found a way to feed the stray cats. Her mother said that nothing — not her daughter's deep love for her two children, not her dreams of a second career as a veterinary tech — had been enough to help Crawford find her way out.

So, said McDonough, of Wilmington, "I often prayed that she would wind up in jail, so that she would be clean and find a program that worked for her."

On Dec. 11, 2023, Crawford, then 43, was arrested for drug possession and reportedly jailed on a bench warrant.

But it wasn't the answer to her mother's prayers.

The next day, McDonough got a call that her daughter had been found unresponsive in a cell.

On Dec. 14, Crawford was pronounced dead — one of at least 25 people who have died in the Philadelphia jails since 2018 of accidents related to drug intoxication, an Inquirer review of medical examiner's data and court records has found.

Some of the deaths were from overdoses; other people were going through withdrawal when they died, according to court filings.

In addition to the 25, one woman took her own life while in withdrawal in the jail, according to a 2022 lawsuit. And at least



**Cops patrol** on Somerset Avenue near Kensington Avenue last month, amid a push to deploy newly trained officers in Kensington.
Alejandro A. Alvarez / Staff Photographer

three more people died in Philadelphia police holding cells, including a man who died by suicide while in withdrawal.

As Philadelphia Mayor Cherelle L. Parker has laid out plans for cleaning up Kensington's open-air drug markets, police leaders have made clear that arresting people who use drugs is part of that plan.

"Many of these individuals are going to get locked up for low-level offenses," Police Commissioner Kevin Bethel told City Council at a May 6 budget hearing.

Some will be eligible for Police Assisted Diversion, which allows people to avoid charges and instead access services. But people with repeated arrest histories, those who are on probation, and those who, like Crawford, have open warrants, are more likely to end up in jail.

The recent history of drug-related deaths within the jails

— and recent internal reports obtained by The Inquirer showing that prisoners are regularly being hospitalized for overdoses — raise questions about whether the direly understaffed facilities can safely house an influx of medically fragile prisoners.

"None of these deaths were determined to have been avoidable," said Bruce Herdman, the jail system's medical director. "We did what we were supposed to do."

The Philadelphia Department of Prisons, which houses people awaiting trial or serving short sentences, is known as a leader in providing medications for opioid use disorder. It's one of just a handful of county jails in Pennsylvania that not only fills existing prescriptions but also offers the opportunity to start on buprenorphine, an opioid that quells cravings.

But in practice, severe short-staffing has hamstrung

those policies — and fueled a climate of disorder and violence in the jails, which in the last few years have seen riots, a string of escapes, and dozens of deaths.

Civil rights lawyers, representing the 4,500 people locked in the Northeast Philadelphia jail complex, in a class-action lawsuit filed in 2020, have urged a federal judge to hold the city in contempt — for the third time in four years — for its ongoing failure to address unconstitutional conditions in the city jails.

A monitor, appointed by the judge in that case, reported that although jail policy requires an assessment within four hours of admission, that happens less than 30% of the time. Herdman said most people are screened within 15 hours.

Four months ago, the jail's medical staff began offering prisoners buprenorphine during their intake process to ease withdrawal. (Before, treatment was limited to addressing digestive issues, aches and other secondary symptoms.) But, he said, a dearth of correctional officers has created a weeks-long backlog in the jail's addiction treatment program, which is separate from the medical treatment offered at intake.

Nationally, nearly 70% of people in county jails have some form of substance use disorder, studies have found.

And drug- and alcohol-related deaths in jail have been on the rise — quadrupling nationwide between 2000 and 2019, the most recent year tracked by the Bureau of Justice Statistics.

Meanwhile, illegal drugs are readily available in the jails, according to corrections officers, prisoners, and advocates alike, who report that acrid clouds of smoke from the drug K2, a type of synthetic marijuana, perme-

ate the units.

While staff are trained to administer naloxone, the overdose reversing drug, incarcerated people have described units left unstaffed for hours on end — leaving medical emergencies unnoticed. One prisoner, in a recent lawsuit, said that after he was attacked in April, he lay with a broken kneecap for 12 hours before staff showed up.

McDonough is skeptical that the city's plan to clean up Kensington will save other young women like her daughter.

"I don't see an end to it. They're going to find drugs whenever they can, wherever they can, and the drug dealers are going to be out there pushing it, selling it, giving it away sometimes," she said. "I think my daughter was just a victim of it all and couldn't find her way out."

### Danger from street to cell

Locking up people who are in addiction — and who, given Philadelphia's increasingly unpredictable drug supply, may be using an uncertain cocktail of substances — can pose danger from the street all the way to the jail cell, recent incidents show.

In 2020, a 28-year-old man visiting from Maine, Jonathon Dowd, overdosed and was revived with naloxone when police arrived. Dowd was disoriented and combative — a common reaction for people revived with the drug, which can send a person into sudden withdrawal. Police allegedly responded by slamming his head onto the pavement and punching him in the face. Dowd died of head trauma, according to a lawsuit that was settled for $275,000.

According to a police spokes-
See **JAILS** on Page 12

Exhibit-1.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
MALIK SOLOMON
          Plaintiff         :    CIVIL ACTION
                            :
     VS.                    :    No. 24-5606
                            :
CITY OF PHILADELPHIA, et al.,:
          Defendants        :    Jeffrey L. Schmehl,  J.
```

CERTIFICATE OF SERVICE

I hereby certify that I am serving the below listed document upon the below listed parties, and in the manner listed below:

MANNER OF SERVICE:

UNITED STATES FIRST MAIL, POSTAGE PRE PAID

DOCUMENT SERVED:

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION
TO DISMISS PURSUANT TO RULE 12(b)(6)

PERSONS SERVED:

Derek Kane, Esq
Deputy City Solicitor
1515 Arch Street, 14th FL.
Philadelphia Pa. 19102

Sara Gray, Esq.
Bennett Bricklin Saltzburg
6000 Sagemore Dr. Ste 6103
Marlton, NJ. 08053

George Wylesol
Clerk of Court
United States District Court
601 Market Street
Philadelphia Pa. 19106-9865

The Honorable Judge
Jeffrey L. Schmehl
United States District Court
504 Hamilton Street
Allentown, Pa. 18101

Respectfully Submitted

DATE: 2-10-26

Malik Solomon, KC-2341
SCI-Phoenix
1200 Mokychic Drive
Collegeville Pa. 19426-0244

Malik Solomon
KC-2341
SCI-Phoenix
1200 Mokychic Dr.
Collegeville, PA. 19426




George Wylesol
Clerk of Court
United State District Court
601 Market Street
Philadelphia, PA. 19106-9865

X-RAY
USMS

RECEIVED
FEB 13 2026